*In re* LEWANDOWSKI'S ESTATE.

SZYNISZEWSKI *v.* STANIECKI.

1. WILLS—UNDUE INFLUENCE.
   Undue influence may not be predicated on opportunity alone.[1]

2. WITNESSES—EXPERT WITNESSES—HYPOTHETICAL QUESTIONS.
   The proper method of interrogating an expert witness hypothetically is to state in the hypothetical question and assume as true facts which there is some testimony to support.[2]

3. APPEAL AND ERROR—DIRECTED VERDICT.
   In reviewing a judgment entered on a directed verdict, the Supreme Court will view the testimony in favor of appellant in its most favorable light.[3]

4. WILLS—MENTAL COMPETENCY—QUESTION FOR JURY.
   Where, in a will contest case, the testimony of physicians that, on the night the will was claimed to have been executed, testatrix was in a state of coma from which it would be impossible to arouse her sufficiently to execute a will was uncontradicted, the trial court was in error in directing a verdict in favor of proponents, although

[1]Wills, 40 Cyc. p. 1145; [2]Evidence, 22 C. J. § 795; [3]Appeal and Error, 4 C. J. § 2709.

their testimony that the will was so executed was also uncontradicted; issue thus raised being for the jury.[4]

5. WITNESSES—PRACTICE OF ATTORNEYS ACTING AS WITNESSES NOT COMMENDED.

The practice of attorneys of record for the respective parties in participating as leading witnesses on the issues involved is not to be commended.[5]

Error to Wayne; Moynihan (Joseph A.), J. Submitted January 7, 1926. (Docket No. 49.) Decided October 4, 1926.

Ursula Szyniszewski presented for probate the last will of Antonina Lewandowski, deceased. The will was certified to the circuit court under the statute. Judgment for proponent on a directed verdict. John B. Staniecki and others, contestants, bring error. Reversed.

*Kaminski & Kowalski,* for appellants.

*August Cyrowski,* for appellee.

STEERE, J. On August 22, 1914, Antonina Lewandowski died in the city of Detroit leaving a last will and testament, the validity of which is the subject of this litigation. At the time of her death she was a widow 70 years of age and had no children. Her nearest shown relatives are the children of a son of her sister and are the contestants in this case. She left an estate valued at $7,650, consisting of a house and lot on Dubois street appraised at $6,000, cash in the Central Savings Bank of Detroit amounting to $1,250 and $400 in cash. The will was executed near the end of her last sickness. It was drawn by the attorney of appellee, Ursula Szyniszewski (hereafter called Ursula). The instrument is in legal form and on its face entitled to probate. Omitting formal parts,

[4]Wills, 40 Cyc. pp. 1331, 1333; 32 L. R. A. (N. S.) 72; 28 R. C. L. 542; [5]Witnesses, 40 Cyc. p. 2233.

the testatrix leaves to Joseph Tucholski of Detroit the sum of $2,000.    He is son of Ursula, who is given the remainder of deceased's estate and appointed by her executrix of her will, which is dated August 19, 1924. After notice of contest was filed in the probate court and bond for removal given, the proceeding was certified under the statute to the circuit court of Wayne county for trial, and there tried by jury.    After hearing proofs and arguments of counsel, the court directed a verdict sustaining the will, followed by a motion for a new trial which was denied.

Appellants' assignments of error center to refusal of the court to submit to the jury the questions of mental incapacity of testatrix, and holding the testimony raised no material issue of fact for the jury.

When her last serious sickness befell deceased, she was living in her own home in Detroit.    She had there two roomers, said Joseph Tucholski and a man named Joseph Sandomierski, who testified through an interpreter that he had roomed at deceased's home for about four years and occasionally did some work for her around the house making repairs; Joseph Tucholski also roomed there for about three years, and she kept two rooms for herself.    She became seriously sick on August 8, 1924, and told him that she would like to get the same doctor Ursula had for her boy. He then went to Ursula's home and so told her, also telling her to come over and see deceased.    She replied that she would telephone for the doctor, and came over in about half an hour.    That afternoon she took deceased to her own home in an automobile driven by her son, Joseph Tucholski.

Thereafter deceased remained with Ursula in the latter's home until she died, visited by her friends and contestants here when and as they saw fit.

Dora Staniecki, a witness called by contestants, who had known deceased for many years and was a widow

of one of the sons of deceased's sister, testified she first learned of her sickness from Ursula, who told her, when coming from church nearly two weeks before deceased died, that she should come to see her aunt who was sick; that she could not take care of her in her own home and she was at Ursula's. Witness visited deceased on two occasions, saw her in her bedroom and talked with her, the last time on the Tuesday before she died. She talked about selling her home and said she "would sell it long ago but she was afraid to live on rent." Witness went away crying, as deceased had told her she had not visited her often enough and the other children did not come to see her very often.

Dr. Persley, her attending physician, testified he was first called to visit deceased about August 15, 1924. That he found she was suffering with a carbuncle in the back of her neck, which was "spread all over her back and neck" and caused her severe pain, extending into her arms. From presence of the carbuncle and odor of acetone he suspected diabetes, and confirmed it later by a more complete diagnosis. He spoke of her going to a hospital and taking insulin, but "she said she would rather die at home than go to a hospital." His testimony bearing upon her mental condition when it is claimed the will was made will be considered later.

Attorney August Cyrowski took the stand as a witness in the case. He testified that on the evening of August 19, 1924, he was called by Joseph Tucholski to go to his mother's house, and he went there between 8:30 and 9 o'clock. He was told what was wanted and talked alone with deceased. She told him she wanted to make her last will, described her property, told where her home was located, that she had no husband living, was a widow with no children, and wanted to leave of her property $2,000 to Joseph

Tucholski and the balance to Ursula Szyniszewski who was not a relative of hers but her benefactress. When he asked her if she wanted to make any other provision in the will she said she did not. He then went to his office, ran off the will on a typewriter, returned to the same house about 10 o'clock, went to deceased's room, read it over to her in English, interpreted it to her in Polish word for word, asked her if she wanted to make any changes and she said no. He then asked her if she was ready to sign it and she said she was; when he talked with her about her will he asked the others to leave the room and they did so. The will was thereafter duly signed by her, making her mark, in the presence of himself and another witness who was called in for that purpose. They signed as witnesses in her presence as certified in the attestation. He tested her memory and condition of mind according to his methods, and in his judgment she was of sound mind.

One of contestants' attorneys, Leonard F. Kowalski, testified that on August 18, 1924, he was called to Ursula's home and taken to deceased's room. She told him she had $1,250 in the bank and wanted it fixed so Ursula could get it, there being something said about their needing money for expenses of sickness. He made out an order for that purpose and she signed it with a cross. He then asked her about her property and inquired if she wanted to make a will, but she "made it plain that she did not want to make a will." On the next day, the 19th, he was called there again by Ursula who told him that deceased wanted to sell her house on Dubois street and showed him to her room where he asked her if she wanted to sell it and "she said yes." He made out some papers and talked with her about what she wanted done and made some suggestions, the result of which was that she would sell her home to Joseph Tucholski for

$6,000 with $2,000 paid down.    He made out a contract to that effect, but when it came to closing the transaction Joseph and his mother did not put up the money.    Deceased did not understand very well the nature of the transaction and he refused to close the deal for them unless the money was paid, and it fell through.    About 7 o'clock that evening Ursula and her son visited his office, said they had money ready to pay and wanted it tended to right away, for deceased was very sick and they were afraid she would die. He started to make the papers but told them to produce the money before he would do so.    They wanted him to give them the papers and said they would attend to paying it.    This he refused to do.    He then "told them to leave the office, and that was the end of it."

On that busy evening there was quite a gathering at the house where deceased lay sick.    One witness testified the kitchen was crowded and there were some children there.    Alexander Swiontanowski was one of them.    He testified he went there to take his father-in-law and mother-in-law who wished to visit deceased and pay some money they owed her; that they arrived there about 7 o'clock and while sitting in the kitchen looking through the open door into deceased's bedroom, he saw his father-in-law and mother-in-law pay her $400; that when she received the money she counted it twice and then called Ursula to count it over again, after which she put it under her pillow.    He further testified that while sitting in the kitchen he saw Cyrowski writing the will in deceased's bedroom. Cyrowski came to the kitchen and asked him if he could talk English well enough to be a witness, to which he replied he could talk broken English and was called into the bedroom.    He there heard Cyrowski read the will over in English to deceased and translate it correctly in Polish, then ask her if that

was her will and if she wanted to make any changes. She replied that was her will, signed it in their presence by making a cross, and they signed it in her presence as witnesses. He tells of her talking with Cyrowski about her property and what she wished to do with it, said the will provided that Joseph Tucholski was to have $2,000 and the rest to go to Ursula, but deceased mentioned some names and said she wanted $200 to go to one person, $100 to another and $100 to another, somebody whose names he did not know. His testimony as to deceased's mental condition is, "Her mental condition at that time was good, and she was sane, and in good condition. She knew what she was doing."

Cyrowski thereafter again called himself to the witness stand and testified in explanation of what deceased said as to money going to others, that when he returned with the drafted will and read it to deceased she said that she wanted to leave $200 to Nikolaj Lewandowski, $100 to John Staniecki and $100 to Stanislawa Staniecki which he made a memorandum of on a carbon copy of the will. This he offered in evidence and it was admitted against objection. In further explanation, he said he told her in that case it would be necessary for him to go and redraft the will, but after talking with Ursula and telling her, "if they come to the funeral and act decently she can pay that money to them, I leave it to her," deceased told him it was unnecessary to redraft the will, it could remain as it was, saying, "if these children or if these people whose names she gave me behaved, then Mrs. Szyniszewski can pay them that money."

Dr. Persley testified he was called to visit deceased on the evening of August 19, 1924, and arrived there about 8 o'clock p. m., saying in part:

"I found her in a state of coma; it is a state of sleep or unconsciousness from which the patient cannot be aroused to full consciousness, and that deepens as it goes on until death. * * *

"When I came there on the 19th she was lying down in bed in a state of deep coma. Coma is more than sleep; it is sleep that you cannot be aroused from. It was just following 8 o'clock in the evening when I came there after being summoned to come and see her. I did not speak to her that night; I discovered that she was in a coma and the room was filled with acetone; I tried to arouse her, shook her by the arm; she could not be aroused."

In the course of a rigid cross-examination he was asked and answered:

"Would it be possible, in your judgment, for her to carry on a conversation, a rational conversation for a period of five or ten minutes?

"*A.* I should doubt it. * * *

"*Q.* It is within the range of possibility, however?

"*A.* Yes, it is in the range of possibility. * * *

"*Q.* In other words, you would not be sufficiently qualified to enable you from the examination which you have made of that person, to say that at that time she was not a person capable of disposing of her property?

"*A.* Yes, I would, because at 8 o'clock of that day, if that is the 19th, I don't know what date it was.

"*Q.* Yes, the 19th.

"*A.* When I saw her she was in a state of deep coma. * * *

"*Q.* Then I understand you, doctor, that a person in a state of deep coma could sit up, do these things as I have indicated, and carry on the conversation as I have indicated, and yet be in a state of coma?

"*A.* No, I maintain that a person in a state of deep coma could not do that."

Dr. Osowski, a duly qualified physician who had not seen deceased and was called as an expert, said he had heard Dr. Persley's testimony and explained at length characteristics of diabetes, which in "high stages" produced coma, saying in part:

"A person in a state of coma is unconscious and that unconsciousness remains and cannot be removed; in diabetes it is the cause of death.

"*Q.* Well, can a person revive from this stage of and condition of coma?

"*A.* There is no case on record where anybody did revive.

"*Q.* Then coma means that a person will not regain his or her consciousness; she will remain so until the end?

"*A.* Yes, sir."

In reply to hypothetical questions by Cyrowski, based on the two attesting witnesses' testimony as to what deceased said and did that evening when she executed the will, assuming that was true, he replied: "She would not be in a state of coma."

Undue influence cannot be predicated on opportunity and the trial court rightly held the proof went no further. We do not find this ruling distinctly assigned as error or argued in the brief of appellants' counsel.

The court apparently directed a verdict on the theory that because no witness was present when they claim the will was signed who could contradict the testimony of the two witnesses Cyrowski and Swiontanowski, it must be taken as true. Detailing their testimony as to what deceased said and did at that time, the court charged the jury that while Dr. Persley said she was in a state of coma he,

"likewise testifies that if she did the things that are in this record, and which are undenied and uncontradicted—if she did that, she would be capable of executing a will. * * * Now, if there were—if questions were injected into the record or denials of Mr. Cyrowski's testimony in that behalf, or if some question or some proof was put into the record that she did not count the money and she did not receive it from the persons, that might present a question of fact for your consideration as to her capacity to execute a will at the time, but as I view it, the testimony standing alone by itself, uncontradicted and not denied, it must be apparent and it must stand here that the testatrix knew what she was doing. * * *

"It was testified by the doctors that if she did all those things related, she could make a will. She was suffering from coma but that she would come out of it at times."

This necessarily assumes that the doctors conceded the truth of the facts stated in those hypothetical questions. They did not. Their professional testimony as to deceased being in a deep coma resulting from diabetes and the possibility of a person so stricken regaining consciousness is also undisputed, except as it conflicts with the testimony of the two attesting witnesses, and, so conflicting, necessarily raises a material issue of fact for the jury. Dr. Persley testified positively that when he visited deceased but a short time before the will is claimed to have been dictated and executed he found her in a deep coma from which she could not be aroused, a state of unconsciousness which deepens as it goes on until death.

Dr. Osowski testified to like effect, basing his answer to hypothetical questions on the truth of the fact she was in a deep coma as testified to by Dr. Persley. On the other hand, basing his opinion on the hypothesis of the truth of the facts related by the attesting witnesses, he necessarily testified there was no coma. The proper method of interrogating an expert witness hypothetically is to state in the hypothetical question and assume as true facts which there is some testimony to support.

"And when his opinion is asked upon a case (such as the physical or mental effects of a disease upon a certain person, under certain circumstances and exhibiting certain symptoms), as stated by other witnesses, when there is no conflict, he is to assume, without undertaking to decide, the truth of their statements, and to base his opinion *only* upon the facts thus assumed, leaving the jury to determine whether such assumed facts are true or false." *Kempsey* v. *McGinniss*, 21 Mich. 123.

In this case there is no conflict in the opinions of professional witnesses testifying as experts, as courts so often experience. To what extent and in what manner testatrix's mind was affected by the disease with which she was afflicted, her mental condition but a short time before it is claimed the will was dictated by her and executed, the possibility or probability of her regaining consciousness within that time, or at all, were material questions of fact upon which the opinions of professional witnesses were competent. To the question before us, appellants' testimony must be viewed in its most favorable light. So viewed, an issue of fact was involved which should have been submitted to the jury under proper instructions.

It is at least unfortunate that attorneys on the respective sides also participated as leading witnesses on the issues involved, and we are constrained to repeat the following reflections on a somewhat analogous situation:

"It is, we think, to be regretted that an attorney of record in the case should find it necessary to support the contention he is bound to make with his own testimony. It is a practice not to be commended, and, while such testimony is competent, its consideration by the court is always a matter of embarrassment, because it is difficult to distinguish between the zeal of the advocate and the fairness and impartiality of a disinterested witness. The practice has received judicial attention in many cases and has found scant approval;" citing numerous cases. *Jacobs* v. *Weissinger*, 211 Mich. 47.

The judgment is reversed and new trial granted, with costs to appellants.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.